THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| AMY G., and GARY G.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED HEALTHCARE, and UNITED BEHAVIORAL HEALTH,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:17-cv-00413-DN-DAO<br><br>District Judge David Nuffer |

This case involves claims for benefits and equitable relief under the Employee Retirement Income Security Act of 1974 ("ERISA") arising from Defendants' denial of insurance coverage for "Wilderness Therapy."[1]

Plaintiffs' child, A.G., received treatment for his mental health conditions at Second Nature Wilderness Family Therapy ("Second Nature") from January 2, 2015, through April 8, 2015.[2] Plaintiffs sought coverage for this treatment through a self-funded benefits plan insured by Plaintiff Amy G.'s employer (the "Plan").[3] Defendants administer claims for benefits under the Plan.[4] Defendants paid a portion of Plaintiffs' claims relating to the individual and group therapy sessions A.G. attended at Second Nature.[5] But Defendants denied coverage for treatment

[1] Complaint and Proposed Class Action ("Complaint") at 11-13, docket no. 2, filed May 17, 2017.

[2] Admin. Record Part 2 at 103. The stipulated administrative record for Plaintiffs' claim for benefits and administrative appeal process (the "Admin. Record") was filed under seal in six parts on July 30, 2021: Admin. Record Part 1 (1-101), docket no. 114-1; Admin. Record Part 2 (102-390) docket no. 114-2; Admin. Record Part 3 (391-409), docket no. 114-3; Admin. Record Part 4 (410-677), docket no. 114-4; Admin. Record Part 5 (678-889), docket no. 114-5; Admin. Record Part 6 (890-1028), docket no. 114-6.

[3] Admin. Record Part 1 at 10-15; Admin. Record Part 5 at 775-787.

[4] Admin. Record Part 1 at 2; Admin. Record Part 6 at 1007-1010.

[5] Admin. Record Part 5 at 780-782.

they deemed "Wilderness Therapy" based on the Plan's exclusion for "Experimental or Investigational or Unproven Services."[6]

Plaintiffs seeks summary judgment on their claim for benefits.[7] They argue that Defendants failed to follow ERISA and the Plan's claim procedure requirements, offering untimely and insufficient explanation and analysis to justify the denial of benefits.[8] Plaintiffs further argue that Defendants wrongly determined that A.G's wilderness treatment at Second Nature was experimental, investigational, or unproven.[9]

Defendants also seek summary judgment on Plaintiffs' claims.[10] Defendants argue that they substantially complied with ERISA and the Plan's claim procedure requirements, and that the decision to deny coverage for A.G's wilderness treatment was not arbitrary and capricious.[11]

Because Defendants failed to provide a sufficient explanation and analysis for the denial of benefits, Defendants' determination that the Plan excluded coverage for A.G.'s treatment at Second Nature was arbitrary and capricious. However, because it is unclear whether Plaintiffs are entitled to benefits under the Plan for this treatment, it is necessary to remand Plaintiffs' claim for benefits to Defendants for reevaluation and redetermination. Determination of whether prejudgment interest and attorney's fees are appropriate is reserved pending the reevaluation and redetermination of Plaintiffs' claim for benefits. Additionally, because Plaintiffs represent that they are no longer pursuing equitable relief, Defendants are entitled to summary judgment on

---

[6] Admin. Record Part 1 at 2-3, 96-97; Admin. Record Part 3 at 402-403; Admin. Record Part 4 at 423-424.

[7] Plaintiffs' Motion for Summary Judgment, docket no. 116, filed Aug. 4, 2021.

[8] *Id*. at 14-23.

[9] *Id*. at 24-30, 34-37.

[10] Defendants' Motion for Summary Judgment, docket no. 112 (redacted version), filed July 30, 2021, docket no. 114, filed under seal July 30, 2021 (unredacted version).

[11] *Id*. at 19-32.

Plaintiffs' claim for equitable relief. Therefore, Plaintiffs' Motion for Summary Judgment[12] is GRANTED in part and DENIED in part, and Defendants' Motion for Summary Judgment[13] is GRANTED in part and DENIED.

**Contents**

UNDISPUTED MATERIAL FACTS ..... 4
The parties, jurisdiction, and venue ..... 4
The Plan ..... 5
UBH's 2015 CTAC Assessment of Wilderness Therapy ..... 8
A.G.'s program at Second Nature and Plaintiffs' claims and appeals ..... 12
DISCUSSION ..... 20
Defendants' decision to deny benefits is reviewed under the arbitrary and capricious standard ..... 21
Defendants' use of and reliance on the 2015 CTAC Assessment of Wilderness Therapy is not improper and does not render the benefits decisions arbitrary and capricious 28
Defendants' failure to respond to the arguments and materials in Plaintiffs' appeals does not render their benefits decisions arbitrary and capricious ..... 32
Defendants' failure to provide sufficient explanation and analysis for the denial of benefits renders their benefits decisions arbitrary and capricious ..... 34
Remand for reevaluation and redetermination of Plaintiffs' claim for benefits is necessary ..... 37
Defendants are entitled to summary judgment on Plaintiffs' claim for equitable relief... 38
Prejudgment interest and attorney's fees are reserved ..... 38
ORDER ..... 40

[12] Docket no. 116, filed Aug. 4, 2021.

[13] Docket no. 112 (redacted version), filed July 30, 2021, docket no. 114, filed under seal July 30, 2021 (unredacted version).

## UNDISPUTED MATERIAL FACTS

### The parties, jurisdiction, and venue

1. Plaintiffs Amy G. and Gary G. are natural persons residing in Dallas County, Texas.[14]

2. A.G. is Amy G. and Gary G.'s minor child.[15]

3. Amy G., Gary G., and A.G are covered by an ERISA-governed group health benefits plan provided through Amy G.'s employer, Geico Corporation (the "Plan").[16]

4. The Plan Administrator is Geico Corporation. The Plan's Claims Administrator is Defendant United Healthcare ("UHC") and its affiliates, who provide certain claim administration services for the Plan. Defendant United Behavioral Health ("UBH") is the mental health claims administrator for the Plan.[17]

5. UHC acts as a third-party claims administrator throughout the United States and in the State of Utah.[18]

6. A.G. received treatment for his mental health conditions at Second Nature in the State of Utah from January 2, 2015, through April 8, 2015.[19]

7. A.G. was eligible for benefits under the Plan during the relevant period in 2015.[20]

---

[14] Admin Record Part 1 at 2.

[15] *Id*. at 16; Admin. Record Part 2 at 103.

[16] Admin. Record Part 4 at 412.

[17] Admin. Record Part 1 at 2; Admin. Record Part 6 at 933, 947, 994, 1007-1010.

[18] Joint Answer at 4, docket no. 4, filed Sept. 1, 2017.

[19] Admin. Record Part 2 at 103.

[20] Joint Answer at 2, 4.

8. UBH denied coverage for certain mental health treatment provided to A.G. at Second Nature based on the Plan's exclusion of coverage for "Experimental or Investigational or Unproven Services."[21]

9. Subject matter jurisdiction exists under 29 U.S.C. § 1132(e)(1).[22]

10. Venue in the District of Utah is appropriate under 28 U.S.C. § 1319(c) and 29 U.S.C. § 1132(e)(2).[23]

**The Plan**

11. The Plan defines services that are "Medically Necessary" as:

> healthcare services provided for the purpose of preventing, evaluating, diagnosing or treating a Sickness, Injury, Mental Illness, substance-related and addictive disorders, condition, disease or its symptoms, that are all of the following as determined by the Claims Administrator or its designee, within Claims Administrator's sole discretion. The services must be:
>
> - in accordance with *Generally Accepted Standards of Medical Practice*;
> - clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for your Sickness, Injury, Mental Illness, substance use disorder disease or its symptoms;
> - not mainly for your convenience or that of your doctor or other health care provider; and
> - not more costly than an alternative drug, service(s) or supply that is at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of your Sickness, Injury, disease or symptoms.
>
> *Generally Accepted Standards of Medical Practice* are standards that are based on credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community, relying primarily on controlled clinical trials, or, if not available, observational studies from more than one institution that suggest a causal relationship between the service or treatment and health outcomes.

---

[21] Admin. Record Part 1 at 2-3, 96-97; Admin. Record Part 3 at 402-403; Admin. Record Part 4 at 423-424.

[22] Admin. Record Part 4 at 412; Joint Answer at 3.

[23] Admin. Record Part 2 at 103; Joint Answer at 3.

> If no credible scientific evidence is available, then standards that are based on Physician specialty society recommendations or professional standards of care may be considered. The Claims Administrator reserves the right to consult expert opinion in determining whether health care services are Medically Necessary. The decision to apply Physician specialty society recommendations, the choice of expert and the determination of when to use any such expert opinion, shall be within The Claims Administrator's sole discretion.
>
> The Claims Administrator develops and maintains clinical policies that describe the *Generally Accepted Standards of Medical Practice* scientific evidence, prevailing medical standards and clinical guidelines supporting its determinations regarding specific services. These clinical policies (as developed by The Claims Administrator and revised from time to time), are available to Covered Persons on www.myuhc.com or by calling the telephone number on the back of your ID card, and to Physicians and other health care professionals on UnitedHealthcareOnline.[24]

12. The Plan defines "Mental Health Services" as:

> Covered Health Services for the diagnosis and treatment of Mental Illnesses. The fact that a condition is listed in the current *Diagnostic and Statistical Manual of the American Psychiatric Association* does not mean that treatment for the condition is a Covered Health Service.[25]

13. The Plan defines "Mental Illness" as:

> Mental health or psychiatric diagnostic categories listed in the current *Diagnostic and Statistical Manual of the American Psychiatric Association*, unless they are listed in Section 6, Exclusions.[26]

14. The Plan contains the following exclusion of coverage for "Experimental or Investigational or Unproven Services:"

> Experimental or Investigational Services and Unproven Services and all services related to Experimental or Investigational and Unproven Services are excluded. The fact that an Experimental or Investigational or Unproven Service, treatment, device or pharmacological regimen is the only available treatment for a particular condition will not result in Benefits if the procedure is considered to be

[24] Admin. Record Part 6 at 999-1000 (emphasis in original).

[25] *Id*. at 1000 (emphasis in original).

[26] *Id*. (emphasis in original).

Experimental or Investigational or Unproven in the treatment of that particular condition.[27]

15. The Plan defines "Unproven Services" as:

health services, including medications that are determined not to be effective for treatment of the medical condition and/or not to have a beneficial effect on health outcomes due to insufficient and inadequate clinical evidence from well-conducted randomized controlled trials or cohort studies in the prevailing published peer-reviewed medical literature:

- Well-conducted randomized controlled trials are two or more treatments compared to each other, with the patient not being allowed to choose which treatment is received.
- Well-conducted cohort studies from more than one institution are studies in which patients who receive study treatment are compared to a group of patients who receive standard therapy. The comparison group must be nearly identical to the study treatment group.

[UHC] has a process by which it compiles and reviews clinical evidence with respect to certain health services. From time to time, [UHC] issues medical and drug policies that describe the clinical evidence available with respect to specific health care services. These medical and drug policies are subject to change without prior notice. You can view these policies at www.myuhc.com.

Please note:

- If you have a life threatening Sickness or condition (one that is likely to cause death within one year of the request for treatment), [UHC] may, at its discretion, consider an otherwise Unproven Service to be a Covered Health Service for that Sickness or condition. Prior to such consideration, [UHC] must first establish that there is sufficient evidence to conclude that, albeit unproven, the service has significant potential as an effective treatment for that Sickness or condition.

The decision about whether such a service can be deemed a Covered Health Service is solely at [UHC]'s discretion. Other apparently similar promising but unproven services may not qualify.[28]

---

[27] *Id*. at 962.

[28] *Id*. at 1005.

16. Under the Plan, upon the denial of a post-service claim, Plaintiffs were entitled to "two levels of appeal" through UBH's internal administrative appeals process.[29]

17. The Plan provides that "[UHC] must notify [the claimant] of the first level appeal decision within: **30 calendar days** after receiving the first level appeal."[30]

18. The Plan provides that "[UHC] must notify [the claimant] of the second level appeal decision within: **30 calendar days** after receiving the second level appeal."[31]

**UBH's 2015 CTAC Assessment of Wilderness Therapy**

19. On January 30, 2015, UBH's Clinical Technology Assessment Committee ("CTAC") reviewed clinical evidence on "Wilderness Therapy" and approved the 2015 CTAC Assessment to help UBH's clinicians determine whether "Wilderness Therapy" services are proven services under the plans UBH administers, including Plaintiffs' Plan.[32]

20. The 2015 CTAC Assessment of Wilderness Therapy "Overview" states:

> Wilderness Therapy is a behavioral health intervention for children and adolescents with emotional, addiction, and/or psychological problems. The intervention typically involves emergence into the wilderness or a wilderness-like setting, group-living with peers, administration of individual and group therapy sessions, and educational/therapeutic curricula including back country travel and wilderness living skills. This type of therapy aims to remove children and adolescents from negative influences and destructive patterns in their lives by placing them into a therapeutic environment. Many of these programs attempt to differentiate themselves from wilderness boot camps, which rely heavily on punishment, confrontation and deprivation in order to gain compliance and obedience. Some wilderness programs are nationally certified by agencies such as the Council of Accreditation and the Joint Commission on Accreditation of Health Organizations. Many are licensed by state agencies.

---

[29] *Id*. at 975-976.

[30] *Id*. at 982 (emphasis in original).

[31] *Id*. (emphasis in original).

[32] *Id*. at 1014-1028.

According to the U.S. Government Accountability Office (GAO):

> *"...some of these programs are funded publicly by state and local government agencies, while other are privately owned and operated. Private treatment programs typically market their services to the parents of troubled teenagers – boys and girls with a variety of addiction, behavioral, and emotional problems – and provide a range of services, including drug and alcohol treatment, confidence building, military-style discipline, and psychological counseling for illnesses such as depression and attention deficit disorder."*

Wilderness Therapy may be identified by other terms in the research literature, including: "Wilderness Treatment", "behavior management through adventure"; "residential wilderness", "Adventure Therapy", "Nature-Assisted Therapy", "Nature-Based Therapy", "Adventure-Based Counseling", "Wilderness Adventure Therapy", and "Outdoor Behavioral Healthcare".

A review of available programs on the internet found that many wilderness therapy programs cost approximately $400-500 per day of treatment. Length of treatment can range anywhere from 1 day to 6 months.[33]

21. In assessing whether "Wilderness Therapy" constitutes a proven or unproven service, the CTAC identified 12 published studies evaluating the effectiveness of "Wilderness Therapy" programs that the CTAC had previously reviewed as part of its 2013 assessment on the same subject.[34]

22. The CTAC also conducted "a search . . . to identify additional controlled trials or well-designed prospective studies that have been recently published on Wilderness Therapy for the targeted indications."[35]

23. In total, the CTAC identified 14 studies on the safety and effectiveness of "Wilderness Therapy" programs published between 2003 and 2014, and summarized the findings and methodology of each of those studies.[36]

---

[33] *Id*. at 1015 (emphasis in original; internal citation omitted).

[34] *Id*. at 1020.

[35] *Id*.

[36] *Id*. at 1020-1024.

24. The CTAC also reviewed independent examinations of "Wilderness Therapy" programs by professional societies and government agencies.[37]

25. The CTAC noted that according to the Alliance for the Safe, Therapeutic & Appropriate Use of Residential Treatment:

> Even in [Wilderness] programs that are considered the best in the industry, children have experienced:
>
> - Inexperienced, untrained staff accompanying youth into the wilderness. Parents have reported that this was "not as advertised"
> - Children being accused of "lying", "faking", or "manipulating" when they report symptoms of potentially deadly medical conditions, such as dehydration and heatstroke, then staff members failing to treat the symptoms, leading to injury or death of the child
> - Children not receiving a medical exam okaying them for strenuous activity before vigorous hikes in wilderness areas far from medical care
> - Food and water being denied, or strictly rationed, as punishment, a vary dangerous form of "tough love" in a wilderness environment.[38]

26. The CTAC also reviewed a 2007 report by the United States Government Accountability Office finding "thousands of allegations of abuse, some of which involved death, at [wilderness therapy programs] between the years of 1990 and 2007."[39]

27. The CTAC considered guidance from the American Academy of Child and Adolescent Psychiatry ("AACAP"), a non-profit physician specialty association, which issued statements in 2009 and 2010. The 2009 statement indicating that the AACAP "does not endorse

---

[37] *Id*. at 1015-1017,

[38] *Id*. at 1015-1016.

[39] *Id*. at 1016 (emphasis in original; internal citations omitted).

boot camp or wilderness programs and encourages all health insurance plans to allow for a continuum of levels of care for children and adolescents." The 2010 statement indicated that:

> *At times state statute defines "boot camps" or "wilderness therapy programs" as residential treatment centers, but frequently they do not provide the array or intensity of services that would meet the definition of a clinical residential treatment center. Most of the "boot camps" and "wilderness programs" do not utilize a multidisciplinary team that includes psychologists, psychiatrists, pediatricians, and licensed therapists who are constantly involved in the child's care. Also, [national accreditation bodies such as] the Joint Commissions nearly universally denies certification for these types of programs that fail to meet the quality of care guidelines for medically supervised care from licensed mental health professionals.*[40]

28. The CTAC also reviewed "Practice Parameters" issued by the AACAP for the treatment of children and adolescents with Oppositional Defiant Disorder, Substance Use Disorders, and Conduct Disorder, none of which recommend the use of "Wilderness Therapy" as an appropriate treatment intervention.[41]

29. The CTAC also considered 2014 statements from the National Institutes of Health indicating that "many Behavioral Modification Schools, Wilderness Programs and Boot Camps are sold to parents as solutions to Conduct Disorder. These programs may use a form of attack therapy or confrontation which may actually be harmful. There is no research support for such techniques. Research suggest that treating children at home along with their families is more effective."[42]

30. The CTAC also considered an "[e]vidence review" by the United States Substance Abuse and Mental Health Services Administration on the efficacy of "outdoor therapy

---

[40] *Id*.

[41] *Id*. at 1016-1018.

[42] *Id*. at 1018.

for youth with behavioral, psychological, and learning disabilities" in which the study found that "[l]ittle evidence for the degree of intervention fidelity was presented."[43]

31. The CTAC acknowledged that "[t]he wilderness therapy literature contains a number of studies that suggest participants show some level of improvement on both behavioral health outcomes and recidivism rates for juvenile offenses." But the CTAC concluded:

> [T]he reviewed studies and guidelines did not reveal conclusive positive health outcomes, or that Wilderness Therapy was equivalent to or better than procedures currently in use. There also continues to be substantial limitations in the research methodology used to examine many of these programs. Most notably, there is a lack of randomized controlled trials or well-designed cohort studies that would allow causal conclusions about the impact of wilderness therapy to be drawn. There is also a lack of demonstrated durability of effect; few of the reviewed studies included follow-up measures, none of which included follow-up of a comparison group.[44]

32. Based on its review of the published literature, statements by professional societies, and government reviews, the CTAC concluded that "Wilderness Therapy is recommended unproven, potentially unsafe, and not medically necessary for emotional, addiction, and/or psychological problems among children and adolescents."[45]

**A.G.'s program at Second Nature and Plaintiffs' claims and appeals**

33. Upon A.G's admission at Second Nature, Plaintiffs "reported primary concerns regarding a significant history of defiance, depression, ADHD symptoms and social dysfunction."[46]

---

[43] *Id*. at 1018-1019.

[44] *Id*. at 1025-1026.

[45] *Id*. at 1026.

[46] Admin. Record Part 1 at 65.

34. At Second Nature, A.G. received individual therapy and family intervention once a week and group therapy sessions twice a week, which were led by a psychologist, Dr. Steve DeBois.[47]

35. The remainder of the services A.G. received at Second Nature consisted of taking part in various activities in the wilderness "milieu" led by Second Nature's non-clinical "wilderness staff," and not by Dr. DeBois. These activities included "creating his own fire with primitive technology and completing chores," "hiking" and "shelter making," and "drawing, painting, music, and movement."[48]

36. At the time of A.G.'s discharge from Second Nature, Dr. DeBois diagnosed A.G. as having "Oppositional Defiant Disorder, Mild[;]" "Attention Deficit/Hyperactivity Disorder, Combined Presentation, Moderate[;]" and "Persistent Depressive Disorder, in partial remission, in full remission[.]"[49]

37. After A.G. completed his stay at Second Nature, Plaintiffs submitted claims to UBH seeking reimbursement for approximately $47,045 in charges from Second Nature.[50]

38. UBH paid benefits for the individual and group therapy sessions A.G. attended at Second Nature "BASED ON A DATABASE OF COMPETITIVE FEES FOR SIMILAR SERVICES OR SUPPLIES IN [THE] AREA."[51]

---

[47] *Id*.

[48] *Id*. at 65, 67, 71-72.

[49] *Id*. at 65.

[50] *Id*. at 10-15; Admin. Record Part 5 at 783-791.

[51] Admin. Record Part 5 at 775-782.

39. Plaintiffs did not appeal UBH's determination of the allowable amount on the claims for A.G's individual and group therapy sessions at Second Nature.[52]

40. In July 2015, UBH denied Plaintiffs' claims regarding the other services and treatment A.G. received at Second Nature on the administrative ground that requested medical records were not timely submitted to UBH. The Explanation of Benefits ("EOB") specifically noted:

> B5 – ADDITIONAL INFORMATION WE REQUESTED FROM THE MEMBER WAS NOT RECEIVED WITHIN THE REQUIRED TIMEFRAME. CHARGES WERE DENIED.
>
> T2 – YOUR PLAN DOES NOT COVER MENTAL HEALTH AND/OR SUBSTANCE ABUSE SERVICES WHEN THEY ARE PROVIDED IN CONNECTION WITH CONDITIONS NOT CLASSIFIED IN THE DIAGNOSTIC AND STATISTICAL MANUAL OF THE AMERICAN PSYCHIATRIC ASSOCIATION.[53]

41. Amy G. initiated a first-level internal appeal of the denial of coverage by letter dated January 13, 2016 ("First Appeal"), which UBH received on January 19, 2016.[54]

42. In the First Appeal, Amy G. disputed that Defendants had not timely received the necessary documentation to evaluate the claims for benefits. The appeal letter included reference to the opinion of Dr. Michael Gass that the medical records provided by Second Nature were complete and in compliance with standards of the medical industry and the State of Utah. Amy G. requested reconsideration of the denial and asked that UBH approve payment of the claims because A.G.'s treatment at Second Nature met the Plan's definition of medically necessary services.[55] She also attached to her appeal letter, among other items: UHC's requests for Second

---

[52] Admin. Record Part 1 at 16-93; Admin. Record Part 2 at 103-389; Admin. Record Part 4 at 418-677; Admin. Record Part 5 at 678-720.

[53] Admin. Record Part 5 at 783-791.

[54] Admin. Record Part 1 at 2, 16-93.

[55] *Id*. at 16-19.

Nature's medical records; Second Nature's fax activity logs; the National Committee for Quality Assurance's Guidelines for Medical Record Documentation; and A.G.'s medical records from Second Nature.[56]

43. UBH responded to the First Appeal by letter dated February 17, 2016 ("First Appeal Denial Letter"). UBH maintained the denial of benefits on clinical grounds without reference to the timeliness or completeness of the medical record submissions. The denial did not rest on the administrative grounds previously identified by UBH in July 2015.[57]

44. The First Appeal Denial Letter indicated that Dr. Thomas Blocher, UBH's Associate Medical Director, had reviewed Amy G.'s appeal letter, case notes, and medical records, and determined, after fully investigating the appeal's substance, that benefit coverage was not available for the following reason:

> Wilderness Therapy is at this time considered by [UBH] to be an experimental/investigational/unproven services, per the [UBH CTAC]'s most recent review of the research literature. The member's policy section pertaining to benefit Exclusions indicates that experimental/investigational/unproven services are excluded from benefit coverage under the member's plan.[58]

45. The First Appeal Denial Letter also explained Amy G.'s rights regarding a second-level internal appeal; directed Amy G. to an internet address where she could access the clinical policy used to determine the First Appeal; and explained how Amy G. could request paper copies of the documents used in making the determination.[59]

46. The First Appeal Denial Letter did not expressly address the arguments and information Amy G. presented in the First Appeal, and did not include any explanation or

---

[56] *Id*. at 30-37, 39-41, 46-47, 65-93.

[57] *Id*. at 2-3.

[58] *Id*. at 2.

[59] *Id*. at 2-6.

analysis of how or why the denied services A.G. received at Second Nature qualify as "Wilderness Therapy" under the 2015 CTAC Assessment.[60]

47. By letter dated April 14, 2016, Plaintiffs submitted a second internal appeal to UBH, which purported to be a "level one appeal regarding the medical necessity of [A.G.]'s claims at Second Nature" ("Second Appeal"), and which UBH received on April 18, 2016.[61]

48. Plaintiffs argued in the Second Appeal that Dr. Blocker incorrectly evaluated A.G.'s treatment at Second Nature; incorrectly identified the wilderness services at Second Nature as experimental, investigational, or unproven; and failed to consider the medical necessity of the wilderness services A.G. received. Plaintiffs requested reconsideration of the denial and asked that UBH approve payment of the claims.[62] They also identified and attached several articles from scholarly and medical journals regarding the legitimacy and effectiveness of wilderness and outdoor therapy programs.[63]

49. UBH responded to the Second Appeal by letter dated May 17, 2016 ("Second Appeal Denial Letter"). UBH maintained the denial of benefits on clinical grounds.[64]

50. The Second Appeal Denial Letter indicated that Dr. Nelson P. Gruber, a licensed psychiatrist and UBH's Associate Medical Director, had reviewed the "appeal letter, medical record, UBH case notes, Optum Level of Care Guideline for the Mental Health Residential Treatment Center Level of Care, Coverage Determination Guideline on Proven and Unproven Services, [CTAC] 2015 Re review on Wilderness Therapy." Dr. Gruber determined, after fully

---

[60] *Id*. at 423-426.

[61] Admin. Record Part 1 at 96; Admin. Record Part 2 at 103-389; Admin. Record Part 4 at 423.

[62] Admin. Record Part 2 at 103-110.

[63] *Id*. at 104-107, 114-285.

[64] Admin. Record Part 4 at 423-426.

investigating the appeal's substance, that benefit coverage was not available for the following reason:

> Based on the Optum Level of Care Guideline for the Mental Health Residential Treatment Center Level of Care and the Coverage Determination Guideline for Proven and Unproven Behavioral Health Services, it is my determination that no authorization can be provided from 01/02/2015.
>
> Your child was admitted to a Wilderness Therapy program . . . . After reviewing the available information, it is noted that your child's Wilderness Therapy treatment is considered Unproven and therefore not a covered benefit. The member's policy section pertaining to benefit Exclusions indicates that unproven services are excluded from benefit coverage under the member's plan. Your child could have been provided care in the Mental Health Partial Hospitalization Program Setting.[65]

51. The Second Appeal Denial Letter also explained Plaintiffs' rights regarding a second-level internal appeal; directed Plaintiffs to an internet address where they could access the clinical policy used to determine the Second Appeal; and explained how Plaintiffs could request paper copies of the documents used in making the determination.[66]

52. The Second Appeal Denial Letter did not expressly address the arguments and information Plaintiffs presented in the Second Appeal, and did not include any explanation or analysis of how or why the denied services A.G. received at Second Nature qualify as "Wilderness Therapy" under the 2015 CTAC Assessment.[67]

53. By letter dated July 11, 2016, Amy G. submitted a third internal appeal to UBH, which was styled as a "Level Two Member Appeal" ("Third Appeal"), and which UBH received on July 12, 2016.[68]

---

[65] *Id*. at 423-424.

[66] *Id*. at 425-426.

[67] *Id*. at 423-426.

[68] *Id*. at 418-677; Admin. Record Part 3 at 392; Admin. Record Part 5 at 678-720.

54. Amy G. argued in the Third Appeal that UBH failed to comply with the requirement for a "full and fair" review because the Second Appeal Denial Letter contained "generic form language" and did not address any of her arguments. She disagreed with the determination that A.G.'s treatment as Second Nature was unproven. And she cited to A.G.'s medical records discussing his conditions and the medical necessity of his treatment at Second Nature. She requested reversal of the denial and full payment for all outstanding claims.[69] She also attached A.G.'s medical records from Second Nature which discussed Dr. DeBois's involvement in and coordination and monitoring of A.G.'s treatment plan, therapy sessions, therapeutic assignments, and progress.[70]

55. UBH responded to the Third Appeal by letter dated July 15, 2016 ("Third Appeal Response Letter"). UBH indicated that Plaintiffs "had exhausted all internal member appeal/grievance options," and that "[t]here are no additional options for an appeal review."[71]

56. The Third Appeal Response Letter also explained Plaintiffs' rights regarding an independent external review; and explained how Plaintiffs could request paper copies of the documents used in making the non-coverage determination.[72]

57. On November 1, 2016, UBH sent Plaintiffs a "CORRECTED" version of the Second Appeal Denial Letter, which included a corrected member address; a directory of state "Ombudsman" contact information; and a language access form. This version was substantially

[69] Admin. Record Part 4 at 418-421.

[70] Admin. Record Part 5 at 679-720.

[71] Admin. Record Part 3 at 392-394.

[72] *Id*. at 393-394.

identical to the Second Appeal Denial Letter, including its basis for denying coverage and its explanation of Plaintiffs' rights regarding a second-level internal appeal.[73]

58. By letter dated December 9, 2016, Amy G. resubmitted the Third Appeal to UBH, requesting that it be processed as a "level 2 member appeal" ("Resubmitted Third Appeal"), which UBH received on December 19, 2016.[74]

59. UBH responded to the Resubmitted Third Appeal by letter dated January 11, 2017 ("Third Appeal Denial Letter").[75]

60. The Third Appeal Denial Letter indicated that Dr. Rakesh J. Desai, a licensed psychiatrist and UBH's Associate Medical Director, had "completed an appeal/grievance review" on the Resubmitted Third Appeal, which included examination of the "medical records, case records." Dr. Desai determined, after fully investigating the appeal's substance, that benefit coverage was not available for the following reason:

> Based on the Optum Level of Care Guideline for the Mental Health Residential Treatment Center Level of Care, it is my determination that no authorization can be provided from 01/02/2015 forward.
>
> Your child was admitted for treatment of oppositional defiant disorder. After reviewing the available information, it is noted that your child's Wilderness Therapy treatment is considered Unproven by Optum [CTAC] and therefore not a covered benefit. The member's policy section pertaining to benefit Exclusions indicates that unproven services are excluded from benefit coverage under the member's plan. Your child could have been provided care in the Mental Health Partial Hospitalization Program Setting.[76]

61. The Third Appeal Denial Letter stated that it was "the Final Adverse Determination of [Plaintiffs'] internal appeal," and that "[a]ll internal appeals through UBH have

[73] Admin. Record Part 1 at 96-101.

[74] Admin. Record Part 3 at 402; Admin. Record Part 4 at 411.

[75] Admin. Record Part 3 at 402-408.

[76] *Id*. at 402.

been exhausted." The Third Appeal Denial Letter also directed Plaintiffs to an internet address where they could access the clinical policy used to determine the Third Appeal, and explained how Plaintiffs could request paper copies of the documents used in making the determination.[77]

62. The Third Appeal Denial Letter did not expressly address the arguments and information Amy G. presented in the Third Appeal, and did not include any explanation or analysis of how or why the denied services A.G. received at Second Nature qualify as "Wilderness Therapy" under the 2015 CTAC Assessment.[78]

63. On May 17, 2017, Plaintiffs filed their Complaint against Defendants, asserting claims for benefits and equitable relief under ERISA arising from Defendants' denial of benefits for A.G.'s treatment at Second Nature.[79]

**DISCUSSION**

Plaintiffs seeks summary judgment on their claim for benefits.[80] Defendants also seek summary judgment on Plaintiffs' claims.[81] Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[82] A factual dispute is genuine when "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way"[83] or "if a reasonable jury could return a verdict for the nonmoving party."[84] A fact is material if "it is essential to the proper disposition

---

[77] *Id*. at 403,408.

[78] *Id*. at 423-426.

[79] Complaint.

[80] Plaintiffs' Motion for Summary Judgment.

[81] Defendants' Motion for Summary Judgment.

[82] FED. R. CIV. P. 56(a).

[83] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

[84] *Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1529 (10th Cir. 1994) (internal quotations omitted).

of [a] claim."[85] And in ruling on a motion for summary judgment, the factual record and all reasonable inferences drawn therefrom are viewed in a light most favorably to the nonmoving party.[86]

The moving party "bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law."[87] If the moving party carries this initial burden, the nonmoving party "may not rest upon mere allegations or denials of [the] pleading[s], but must set forth *specific facts* showing that there is a *genuine issue* for trial as to those dispositive matters for which it carries the burden of proof."[88] "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient to defeat a properly supported motion for summary judgment."[89]

**Defendants' decision to deny benefits is reviewed under the arbitrary and capricious standard**

"[A] denial of benefits challenged under [29 U.S.C.] § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[90] "[I]f the plan gives the administrator discretionary authority, [courts] employ a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious."[91]

---

[85] *Adler*, 144 F.3d at 670.

[86] *Id.*

[87] *Id*. at 670-71.

[88] *Universal Money Ctrs., Inc.*, 22 F.3d at 1529 (internal quotations and citations omitted; emphasis in original).

[89] *Id.* (internal quotations omitted).

[90] *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

[91] *Hodges v. Life Ins. Co. of N.A.*, 920 F.3d 669, 675 (10th Cir. 2019) (internal quotations omitted).

The plain language of Plaintiffs' Plan expressly grants Defendants discretionary authority to decide whether a treatment or supply is covered by the Plan.[92] The Plan's plain language also expressly grants Defendants discretionary authority in determining whether a specific treatment is unproven.[93] Therefore, the discretionary authority given to Defendants under the Plan entitles Defendants' benefits decisions to the deferential arbitrary and capricious standard of review.

Plaintiffs do not dispute that the Plan grants Defendants discretionary authority in deciding coverage and whether treatments are unproven. Plaintiffs nevertheless argue that a *de novo* standard should apply to Defendants' benefits decisions because Defendants failed to comply with ERISA and the Plan's claim procedure requirements by failing to sufficiently respond to the arguments and information in Plaintiffs' appeals and by untimely responding to Plaintiffs' Third Appeal.[94] The Tenth Circuit Court of Appeals has recognized that under certain circumstances *de novo* review is appropriate despite a plan's conferral of discretion on a plan administrator.[95] These circumstances include: the administrator's failure to timely exercise its discretion;[96] the administrator's failure to apply its expertise to a decision;[97] serious procedural irregularities,[98] including procedural irregularities in the administrative review process;[99] and lack of notice regarding the administrator's discretionary authority.[100]

---

[92] *Supra* Undisputed Material Facts ¶ 11 at 5-6.

[93] *Id*. ¶ 15 at 7.

[94] Plaintiffs' Motion for Summary Judgment at 14-23.

[95] *James C. v. Aetna Health & Life Ins. Co.*, 499 F. Supp. 3d 1105, 1116-1117 (D. Utah 2020).

[96] *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 631-632 (10th Cir. 2003).

[97] *Id*. at 632.

[98] *Martinez v. Plumbers & Pipefitters Nat. Pension Plan*, 795 F.3d 1211, 1215 (10th Cir. 2015).

[99] *LaAsmar v. Phelps Dodge Corp. Life, Accidental. Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 797-799 (10th Cir. 2010).

[100] *Lyn M. v. Premera Blue Cross*, 966 F.3d 1061, 1065 (10th Cir. 2020).

However, the Tenth Circuit also recognizes that courts should not "apply 'a hair-trigger rule' requiring de novo review whenever the plan administrator, vested with discretion, failed *in any respect* to comply with the procedures mandated by [ERISA]."[101] Courts should instead afford deference to the administrator's benefits decision when the decision is in "substantial compliance" with ERISA claim procedure regulations.[102] An administrator substantially complies with ERISA's claim procedure regulations "if the procedural irregularity was '(1) inconsequential; and (2) in the context of an on-going, good-faith exchange of information between the administrator and the claimant.'"[103]

The record reflects that any irregularities in Defendants' processing and review of Plaintiffs' claims for benefits are not such to warrant a *de novo* standard of review. First, the deficiencies Plaintiffs identify regarding the contents of Defendants' communications are not a failure of Defendants to apply their expertise to the benefits decision, such as when a decision is "deemed denied" by operation of law.[104] Nor are they the type of serious procedural irregularities the Tenth Circuit has recognized as demanding a *de novo* standard, which generally involve delayed benefits decisions that prejudice a claimant.[105] Plaintiffs fail to identify any authority in which a *de novo* standard applied because of an administrator's failure to engage in meaningful dialog or to sufficiently explain the analysis it employed when making a benefits decision.

---

[101] *LaAsmar*, 605 F.3d at 799 (quoting *Finley v. Hewlett-Packard Co. Emp. Benefits Org. Income Prot. Plan*, 379 F.3d 1168, 1173 (10th Cir. 2004)) (emphasis in original).

[102] *Id*. (citing *Finley*, 379 F.3d at 1173-1175; *Gilbertson*, 328 F.3d at 634-635). The Tenth Circuit has questioned whether the substantial compliance exception remains applicable due to revisions in ERISA's claim regulations. *Id*. at 800; *Finley*, 379 F.3d at 1175 n.6. However, the precedent recognizing the exception remains the law of the Circuit.

[103] *LaAsmar*, 605 F.3d at 800 (quoting *Finley*, 379 F.3d at 1174).

[104] *Gilbertson*, 328 F.3d at 631-632.

[105] *LaAsmar*, 605 F.3d at 798-799; *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1318 (10th Cir. 2009).

Indeed, the case law on which Plaintiffs rely applied the arbitrary and capricious standard of review to the administrators' benefits decisions.[106]

The sufficiency of this type of information in benefits denial letters is a substantive issue, which is *analyzed* under the appropriate standard of review. It is not a recognized or adequate basis for *establishing* the appropriate standard of review. Therefore, a failure to engage in meaningful dialog or to sufficiently explain the analysis employed in denying Plaintiffs' claims for benefits does not warrant application of a *de novo* standard of review to Defendants' benefits decisions.

Next, while an administrator's failure to timely exercise its discretion will result in application of a *de novo* standard,[107] Plaintiffs' argument that Defendants untimely provide their benefits decisions is not supported by the record. The record reflects that each time Plaintiffs submitted an internal appeal,[108] UBH complied with the Plan's requirement that it respond with a benefits decision within 30 calendar days after receiving the appeal.[109]

UBH did send Plaintiffs a "CORRECTED" version of its Second Appeal Denial Letter nearly six months after originally sending the Second Appeal Denial Letter.[110] However, this version was substantially identical to the Second Appeal Denial Letter, and did not alter the basis

[106] *David P. v. United Healthcare Ins. Co.*, 77 F.4th 1293, 1307-1308 (10th Cir. 2023); *D.K. v. United Behavioral Health*, 67 F.4th 1224, 1235 (10th Cir. 2023); *McMillan v. AT&T Umbrella Benefit Plan No. 1*, 746 Fed. App'x 697, 705 (10th Cir. 2018); *Caldwell v. Life Ins. Co. of N.A.*, 287 F.3d 1276, 1282 (10th Cir. 2002); *James C.*, 499 F. Supp. 3d at 1118; *Mary D. v. Anthem Blue Cross Blue Shield*, 778 Fed. App'x 580, 587-592 (10th Cir. 2019).

[107] *LaAsmar*, 605 F.3d at 797-799; *Rasenack*, 585 F.3d at 1318; *Gilbertson*, 328 F.3d at 631-632.

[108] *Supra* Undisputed Material Facts ¶ 41 at 14, ¶ 47 at 16, ¶ 53 at 17, ¶ 58 at 19.

[109] *Id.* ¶¶ 17-18 at 8, ¶ 43 at 15, ¶ 49 at 16, ¶ 55 at 18, ¶ 59 at 19.

[110] *Id.* ¶ 49 at 16, ¶ 57 at 18-19.

for UBH's benefits decision in any way.[111] Therefore, the "CORRECTED" version of the Second Appeal Denial Letter does not render UBH's response to the Second Appeal untimely.

Plaintiffs also mischaracterize the record in asserting that Defendants were five months late in responding to the Third Appeal.[112] UBH received the Third Appeal on July 12, 2016,[113] and timely responded three days later, on July 15, 2016, stating that Plaintiffs had exhausted all internal appeals and explaining Plaintiffs' rights regarding an independent external review.[114] Plaintiffs nevertheless point to UBH's Third Appeal Denial Letter, dated January 11, 2017, to support their argument.[115] But the Third Appeal Denial Letter was timely sent in response to Plaintiffs' Resubmitted Third Appeal, which UBH received on December 19, 2016.[116] Therefore, the circumstances do not warrant application of a *de novo* standard based on a failure of Defendants to timely provide their benefits decisions.

But this does not mean there were no procedural irregularities in Defendants' processing and review of Plaintiffs' appeals. In particular, Plaintiffs submitted three internal appeals where the Plan permitted only two internal appeals.[117] Plaintiffs initiated this irregularity by styling their Second Appeal as a "level one appeal regarding the medical necessity of [A.G.]'s claims at Second Nature."[118] Defendants should have treated the Second Appeal as a second-level internal appeal under the Plan.[119] However, UBH permitted the irregularity to persist by including

---

[111] *Id.*

[112] Plaintiffs' Motion for Summary Judgment at 21-23.

[113] *Supra* Undisputed Material Facts ¶ 53 at 17.

[114] *Id.* ¶¶ 55-56 at 18.

[115] Plaintiffs' Motion for Summary Judgment at 21-23.

[116] *Supra* Undisputed Material Facts ¶¶ 58-59 at 19.

[117] *Id.* ¶¶ 17-18 at 8, ¶ 41 at 14, ¶ 47 at 16, ¶ 53 at 17, ¶ 58 at 19.

[118] *Id.* ¶ 47 at 16.

[119] *Id.* ¶ 16 at 8.

information regarding Plaintiffs' rights to a second-level internal appeal in the Second Appeal Denial Letter.[120]

It was not until UBH responded to Plaintiffs' Third Appeal, which Plaintiff styled as a "Level Two Member Appeal," that UBH attempted to correct the irregularity by stating Plaintiffs had already exhausted their internal appeals and explaining Plaintiffs' right to an independent external review.[121] But UBH later resurrected the irregularity by sending Plaintiffs the "CORRECTED" version of the Second Appeal Denial Letter, which again included an explanation of Plaintiffs' rights regarding a second-level internal appeal.[122] This prompted Plaintiffs to resubmit their Third Appeal.[123] And UBH ultimately reviewed the Resubmitted Third Appeal as a second-level internal appeal, thereby exhausting Plaintiffs' internal appeals.[124]

UBH permitting Plaintiffs to have three internal appeals does not warrant application of a *de novo* standard of review to Defendants' benefits decisions. This is not the type of serious procedural irregularity that demonstrates a failure of Defendants to exercise their discretion in making benefits decisions under the Plan, nor is it a failure of Defendants to protect the interests of the Plan's participants and their beneficiaries.[125] Defendants did, in fact, exercise their discretion by making benefits decisions on each of Plaintiffs' internal appeals.[126] And Defendants protected Plaintiffs' interests by affording them a third internal review.[127]

---

[120] *Id.* ¶ 51 at 17.

[121] *Id.* ¶¶ 55-56 at 18.

[122] *Id.* ¶ 57 at 18-19.

[123] *Id.* ¶ 58 at 19.

[124] *Id.* ¶ 59 at 19, ¶ 61 at 19-20.

[125] *LaAsmar*, 605 F.3d at 796-799; *Gilbertson*, 328 F.3d at 631-632.

[126] *Supra* Undisputed Material Facts ¶ 43 at 15, ¶ 49 at 16, ¶ 55 at 18, ¶ 57 at 18-19, ¶ 59 at 19.

[127] *Id.* ¶ 59 at 19.

The third internal review was not consistent with the Plan's authorization of two internal reviews.[128] But it avoided and corrected the inconsistency in UBH's Second Appeal Denial Letter (as well as its "CORRECTED" version),[129] which arguably created a reasonable expectation that Plaintiffs were entitled to submit (and resubmit) their Third Appeal. This procedural irregularity was minor, did not prejudice Plaintiffs, and does not warrant application of a *de novo* standard of review. And regardless, the record demonstrates that Defendants substantially complied with ERISA and the Plan's claim procedure requirements because any irregularities were inconsequential and made in the context of an on-going, good-faith exchange of information between Plaintiffs and Defendants.[130]

Therefore, because the Plan grants Defendants discretionary authority to decide benefits coverage and whether treatments are unproven,[131] Defendants' benefits determinations regarding A.G.'s treatment as Second Nature are entitled to the deferential arbitrary and capricious standard of review.

"Under [the arbitrary and capricious] standard, [the] review is limited to determining whether the interpretation of the plan was reasonable and made in good faith."[132] An administrator's benefits decision will be upheld "so long as it is predicated on a reasoned basis."[133] "There is no requirement that the basis relied upon be the only logical one or even the

---

[128] *Id.* ¶¶ 17-18 at 8.

[129] *Id.* ¶ 51 at 17, ¶ 57 at 18-19.

[130] *LaAsmar*, 605 F.3d at 800 (quoting *Finley*, 379 F.3d at 1174).

[131] *Supra* Undisputed Material Facts ¶ 11 at 5-6, ¶ 15 at 7.

[132] *Hodges*, 920 F.3d at 675 (internal quotations omitted).

[133] *Rizzi v. Hartford Life and Acc. Ins. Co.*, 383 Fed. App'x 738, 748 (10th Cir. 2010) (quoting *Adamson v. Unum Life Ins. Co. of Am.*, 455 F.3d 1209, 1212 (10th Cir. 2006).

superlative one. [The] review inquires whether the administrator's decision resides somewhere on a continuum of reasonableness—even if on the low end."[134]

The Tenth Circuit has held the denial of benefits arbitrary and capricious where the decision lacked "substantial evidence," *i.e.*, "evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decisionmaker[;]"[135] where the administrator failed to explain how the decision was reached;[136] and where the administrator fails to assess all the relevant evidence.[137] A benefits decision that lacks analysis and contains only conclusory statements is arbitrary and capricious.[138]

**Defendants' use of and reliance on the 2015 CTAC Assessment of Wilderness Therapy is not improper and does not render the benefits decisions arbitrary and capricious**

Plaintiffs argue that Defendants use of and reliance on the 2015 CTAC Assessment of Wilderness Therapy is improper and renders their benefits decisions arbitrary and capricious.[139] Specifically, Plaintiffs argue that because the 2015 CTAC Assessment of Wilderness Therapy was never communicated or disclosed to them during the internal appeals process, they were prevented from having a full and fair review.[140]

"ERISA requires administrators to follow specific procedures for benefit denials."[141] "Administrators must 'provide adequate notice in writing . . . setting forth the specific reasons

---

[134] *Id*. (quoting *Adamson*, 455 F.3d at 1212) (internal punctuation omitted).

[135] *Caldwell*, 287 F.3d at 1282.

[136] *DeGrado v. Jefferson Pilot Fin. Ins. Co.*, 451 F.3d 1161, 1175 (10th Cir. 2006).

[137] *Caldwell*, 287 F.3d at 1285-1286.

[138] *McMillan*, 746 Fed. App'x at 706.

[139] Plaintiffs' Motion for Summary Judgment at 17-18, 25, 29-30, 32.

[140] *Id*.; Plaintiffs' Opposition Memorandum to Defendants' Motion for Summary Judgment ("Plaintiffs' Response") at 4-10, 19-20, 26, 28-30, docket no. 120, filed Sept. 10, 2021.

[141] *D.K.*, 67 F.4th at 1236.

for such denial' and 'afford a reasonable opportunity . . . for a full and fair review by the appropriate named fiduciary of the decision denying the claim.'"[142] "For the claimant, . . . the 'full and fair' administrative review required by ERISA means knowing what evidence the decision-maker relied upon, having an opportunity to address the accuracy and reliability of the evidence, and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering [a] decision."[143] It is for this, as well as other reasons, that "ERISA denial letters play a particular role in ensuring full and fair review."[144]

"ERISA regulations require denial letters themselves to be comprehensive[.]"[145] This permits "a 'meaningful dialogue' for a full and fair review."[146] And a court's "[r]eview of the explanation provided to claimants must focus on the content of the denial letters."[147] "[Courts] will not permit ERISA claimants denied the timely and specific explanation to which the law entitled them to be sandbagged by after-the-fact plan interpretations devised for purposes of litigation."[148] "A plan administrator may not treat the administrative process as a trial run and offer a post hoc rationale in district court."[149] Therefore, in reviewing a denial of benefits, "[courts] look only to the reasons for the denial that [the administrator] specifically articulated in the administrative record and conveyed to [the claimant]."[150]

---

[142] *Id*. (quoting 29 U.S.C. § 1133) (emphasis omitted).

[143] *David P.*, 77 F.4th at 1300 (internal quotations omitted).

[144] *D.K.*, 67 F.4th at 1239.

[145] *Id*. at 1242 (citing 29 C.F.R. §§ 2560.503-1(f)(3), (h)(3)-(4)).

[146] *Id*.

[147] *Id*.

[148] *David P.*, 77 F.4th at 1301 (internal quotations omitted).

[149] *Id*. (internal quotations omitted).

[150] *Id*. at 1303.

Plaintiffs' Plan grants Defendants discretion to determine whether a specific treatment is unproven, and the Plan sets forth a process under which treatments are reviewed to determine whether a treatment is unproven.[151] Using this process, UBH approved the 2015 CTAC Assessment of Wilderness Therapy, which recommended that "Wilderness Therapy" is unproven.[152]

The 2015 CTAC Assessment of Wilderness Therapy is part of the stipulated administrative record.[153] Each of the benefits denial letters responding to Plaintiffs' internal appeals state that UBH's reviewer relied on the CTAC's assessment of "Wilderness Therapy" in determining that A.G.'s treatment at Second Nature was unproven and excluded from coverage under the Plan.[154] On this record, Defendants' use of and reliance on the 2015 CTAC Assessment of Wilderness Therapy in denying Plaintiffs' claims for benefits was not, in and of itself, improper or arbitrary and capricious.

The issue is whether Defendants gave Plaintiffs sufficient access to the 2015 CTAC Assessment of Wilderness Therapy. Plaintiffs cite no authority that required Defendants to attach a copy of the 2015 CTAC Assessment of Wilderness Therapy to their benefits denial letters. Indeed, ERISA's "regulations entitle a claimant to 'reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits.'"[155]

The record reflects that Defendants provided Plaintiffs with reasonable access to the 2015 CTAC Assessment of Wilderness Therapy. Each of Defendants' benefits denial letters included

[151] *Supra* Undisputed Material Facts ¶ 15 at 7.

[152] *Id.* ¶¶ 19-32 at 8-12.

[153] *Id.* ¶ 32 at 8.

[154] *Id.* ¶ 44 at 15, ¶ 50 at 16-17, ¶ 57 at 18-19, ¶ 60 at 19.

[155] *Mary D.*, 778 Fed. App'x at 590 (quoting 29 C.F.R. § 2560.503-1(h)(2)(iii)).

an internet website for Plaintiffs to obtain information about the criteria and guidelines that UBH's reviewers relied on.[156] Plaintiffs assert that this website contains no information about the Plan's exclusion for "Experimental or Investigational or Unproven Services" or the 2015 CTAC Assessment of Wilderness Therapy.[157] But Plaintiffs offer no evidence to support this assertion. There is no record evidence that Plaintiffs ever attempted to access the website or these materials during the internal appeals process. Plaintiffs submit a .pdf version of the website accessed on August 2, 2021,[158] several years after Plaintiffs' internal appeals were exhausted.[159] But this document is outside the stipulated administrative record and cannot be considered. And even if the document were considered, it is insufficient to establish the contents of the website during the relevant timeframe of Plaintiffs' internal appeals.

Additionally, regardless of whether the website contained the 2015 CTAC Assessment of Wilderness Therapy, each of UBH's benefits denial letters included information explaining how Plaintiffs could request paper copies of the documents UBH's reviewers used and relied on in making the benefits decisions.[160] There is no evidence that Plaintiffs ever attempted to request a paper copy of the 2015 CTAC Assessment of Wilderness Therapy during their internal appeals process. But Plaintiffs could have done so free of charge.[161]

---

[156] *Supra* Undisputed Material Facts ¶ 45 at 15, ¶ 51 at 17, ¶ 57 at 18-19, ¶ 61 at 19-20.

[157] Plaintiffs' Motion for Summary Judgment ¶¶ 35-37 at 8-9; Plaintiffs' Response at 4-10, 19-20, 26, 28-30.

[158] Plaintiffs' Response ¶ 35 at 8 n.6; Exhibit A, docket no. 116-1, filed Aug. 4, 2021.

[159] *Supra* Undisputed Material Facts ¶ 59 at 19, ¶ 61 at 19-20.

[160] *Id*. ¶ 45 at 15, ¶ 51 at 17, ¶ 57 at 18-19, ¶ 61 at 19-20. The letter UBH sent to Plaintiffs in response to the Third Appeal also included information explaining how Plaintiffs could request paper copies of the documents UBH's reviewers used in making the benefits determination. *Id*. ¶¶ 55-56 at 18.

[161] *Id*. ¶ 45 at 15, ¶ 51 at 17, ¶¶ 55-57 at 18-19, ¶ 61 at 19-20.

On this record, Defendants' use of and reliance on the 2015 CTAC Assessment of Wilderness Therapy in denying coverage for A.G.'s treatment at Second Nature is not improper and does not render their benefits decisions arbitrary and capricious.

**Defendants' failure to respond to the arguments and materials in Plaintiffs' appeals does not render their benefits decisions arbitrary and capricious**

Plaintiffs argue that Defendants' denial of coverage for A.G.'s treatment at Second Nature was arbitrary and capricious because Defendants failed to respond to the arguments and information Plaintiffs provided in their internal appeals.[162]

The "full and fair review" required by ERISA and its implementing regulations "require, among other things, that a plan's administrative review procedures

> - '[p]rovide claimants the opportunity to submit written comments, documents, records, and other information relating to the claim for benefits,' and
>
> - '[p]rovide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.'"[163]

This ensures that a claimant "know[s] what evidence the decision-maker relied upon, ha[s] an opportunity to address the accuracy and reliability of the evidence, and ha[s] the decision-maker consider the evidence presented by both parties prior to reaching and rendering [its] decision."[164]

Plaintiffs are correct that none of Defendants' benefits denial letters include any discussion of the arguments and materials Plaintiffs included in their appeals.[165] But Plaintiffs cite no authority requiring Defendants to affirmatively respond to their arguments and

[162] Motion for Summary Judgment at 15-23.

[163] *David P.*, 77 F.4th at 1299 (quoting 29 C.F.R. § 2560.503-1(h)(2)(ii), (iv)).

[164] *Id*. at 1300 (internal quotations omitted).

[165] *Supra* Undisputed Material Facts ¶ 46 at 15-16, ¶ 52 at 17, ¶ 57 at 18-19, ¶ 62 at 20.

submission. Nor were Defendants required to defer to any contrary conclusions regarding "Wilderness Therapy" contained in the materials Plaintiffs submitted with their appeals.[166] Indeed, ERISA's regulations require only that Defendants "take[]" Plaintiffs' arguments and materials "into account."[167] Each of Defendants' benefits denial letters states that the review included examination of the medical records and case notes, as well as a full investigation of the appeal's substance.[168] This is all that ERISA and the Plan required of Defendants to engage in meaningful dialogue on this issue.[169]

It is true that a plan administrator acts arbitrarily and capriciously when failing to respond to a treating physician's opinions regarding the medical necessity of a claimant's treatments.[170] But that is not the relevant inquiry in this case. Plaintiffs raised the medical necessity of A.G.'s treatment at Second Nature as a basis for their appeals and submitted medical records containing Dr. DeBois's opinions.[171] But Defendants did not dispute those opinions or deny benefits based on a lack of medical necessity. The denial of benefits for A.G.'s treatment at Second Nature was based on the Plan's exclusion for "Experimental or Investigational or Unproven Services."[172] Therefore, it was unnecessary for Defendants' benefits denial letters to include affirmative response to Dr. DeBois's medical necessity opinions.

Although a greater level of specificity and discussion responding to the arguments and materials in Plaintiffs' appeals may be desirable, or even advisable, it was not required in

---

[166] *D.K.*, 67 F.4th at 1241.

[167] 29 C.F.R. § 2560.503-1(h)(2)(iv).

[168] *Supra* Undisputed Material Facts ¶ 44 at 15, ¶ 50 at 16-17, ¶ 57 at 18-19, ¶ 60 at 19.

[169] *Mary D.*, 778 Fed. App'x at 589-590.

[170] *D.K.*, 67 F.4th at 1241.

[171] *Supra* Undisputed Material Facts ¶ 42 at 14, ¶ 48 at 16, ¶ 54 at 18.

[172] *Id.* ¶ 44 at 15, ¶ 50 at 16-17, ¶ 57 at 18-19, ¶ 60 at 19.

Defendants' benefits denial letters. Therefore, Defendants' failure to respond to the arguments and materials in Plaintiffs' appeals does not render their benefits decisions arbitrary and capricious.

**Defendants' failure to provide sufficient explanation and analysis for the denial of benefits renders their benefits decisions arbitrary and capricious**

Plaintiffs argue that Defendants' denial of coverage for A.G.'s treatment at Second Nature was arbitrary and capricious because Defendants failed to provide sufficient explanation and analysis for the denial of coverage, and wrongly determined that A.G.'s treatment at Second Nature was unproven.[173]

As discussed,[174] ERISA "requires that 'every employee benefit plan . . . provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant."[175] ERISA's "regulations further specify that benefit-denial notices sent to claimants set forth, among other things,

> - '[t]he specific reason or reasons for the adverse determination,'
>
> - 'the specific plan provisions on which the determination is based,' and
>
> - 'a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material is necessary.'"[176]

Additionally, "where, as in this case, the benefits denial is made by a 'group health plan' and 'is based on a medical necessity . . . exclusion or limit,' the administrator must also provide the

[173] Motion for Summary Judgment at 15-30.

[174] *Supra* Discussion at 28-29.

[175] *David P.*, 77 F.4th at 1299 (quoting 29 U.S.C. § 1133(1)).

[176] *Id*. (quoting 29 C.F.R. § 2560.503-1(g)(1)(i)-(iii)).

claimant with 'an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances.'"[177]

Benefits denial letters must be "comprehensive"[178] to ensure a "full and fair review" and that a claimant "know[s] what evidence the decision-maker relied upon, ha[s] an opportunity to address the accuracy and reliability of the evidence, and ha[s] the decision-maker consider the evidence presented by both parties prior to reaching and rendering [its] decision."[179] In sum,

> [ERISA] and its implementing regulations thus require a meaningful dialogue between ERISA plan administrators and their beneficiaries. If benefits are denied the reason for the denial must be stated in reasonably clear language, if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it. There is nothing extraordinary about this: it's how civilized people communicate with each other regarding important matters.[180]

Each of Defendants' benefits denial letters explains that "Wilderness Therapy" is considered by UBH to be unproven based on the 2015 CTAC Assessment of Wilderness Therapy.[181] Each of the benefit denial letters also states that A.G.'s "Wilderness Therapy" treatment at Second Nature is excluded from coverage under the Plan's exclusion for "Experimental or Investigational or Unproven Services."[182] These statements are sufficient to meet the requirements of ERISA's regulations that denial notices set forth "specific reason or reasons for the adverse determination" and "specific plan provisions on which the determination is based."[183]

---

[177] *Id*. (quoting 29 C.F.R. § 2560.503-1(g)(1)(v)(B)).

[178] *D.K.*, 67 F.4th at 1236.

[179] *David P.*, 77 F.4th at 1300 (internal quotations omitted).

[180] *Id*. (internal quotations and punctuation omitted).

[181] *Supra* Undisputed Material Facts ¶ 44 at 15, ¶ 50 at 16-17, ¶ 57 at 18-19, ¶ 60 at 19.

[182] *Id*.

[183] 29 C.F.R. § 2560.503-1(g)(1)(i)-(ii).

However, because the denial of benefits was based on a plan exclusion, ERISA's regulations required that Defendants' benefits denial letters provide Plaintiffs with "an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to [A.G.'s] medical circumstances."[184] None of Defendants' benefits denial letters included any explanation or analysis of how or why the services A.G. received at Second Nature qualify as "Wilderness Therapy" under the 2015 CTAC Assessment of Wilderness Therapy.[185] There are no citations to A.G.'s medical records or facts, no description of the services A.G. received at Second Nature, and no application of clinical judgment discussion how or why these services are "Wilderness Therapy" under the 2015 CTAC Assessment of Wilderness Therapy. Rather, Defendants' benefits denial letters contain only conclusory statements that the treatment A.G. received at Second Nature is "Wilderness Therapy."

The burden is on Defendants to show that an exclusion to coverage applies.[186] And to be clear, there is record evidence that A.G.'s treatment at Second Nature included an outdoor or wilderness component.[187] It is possible that these services qualify as "Wilderness Therapy," but nowhere in the record do Defendants convey to Plaintiffs how or why the definition of "Wilderness Therapy" in the 2015 CTAC Assessment of Wilderness Therapy actually applies to these services.[188] In the absence of this information, Plaintiffs did not have the opportunity to address the accuracy and reliability of Defendants' analysis.[189] The absence of this information also makes it unclear whether Plaintiffs are (or are not) entitled to benefits under the Plan.

---

[184] *Id.* § 2560.503-1(g)(1)(v)(B).

[185] *Supra* Undisputed Material Facts ¶ 46 at 15-16, ¶ 52 at 17, ¶ 57 at 18-19, ¶ 62 at 20.

[186] *Pittman v. Blue Cross & Blue Shield of Okla.*, 217 F.3d 1291, 1298 (10th Cir. 2000).

[187] *Supra* Undisputed Material Facts ¶ 35 at 13.

[188] *C.f. Michael D. v. Anthem Health Plans of Ky., Inc.*, 369 F. Supp. 3d 1159, 1173-1174 (D. Utah 2019).

[189] *David P.*, 77 F.4th at 1300.

Defendants' failure to provide a sufficient explanation and analysis for the denial of benefits for A.G.'s treatment at Second Nature is a failure to engage Plaintiffs in the meaningful dialog required by ERISA and its regulations. Plaintiffs were denied a "full and fair review" on their claims for benefits. Therefore, Defendants' determination that the Plan excluded coverage for A.G.'s treatment at Second Nature was arbitrary and capricious.

**Remand for reevaluation and redetermination of Plaintiffs' claim for benefits is necessary**

"[W]hen a reviewing court concludes that a plan administrator has acted arbitrarily and capriciously in handling a claim for benefits, it can either remand the case to the administrator for a renewed evaluation of the claimant's case, or it can award . . . benefits."[190] "Which of these two remedies is proper in a given case, however, depends upon the specific flaws in the plan administrator's decision."[191] "[I]f the plan administrator failed to make adequate findings or to explain adequately the grounds of its decision, the proper remedy is to remand the case to the administrator for further findings or explanation."[192] On the other hand, an award of "benefits is proper where, but for the plan administrator's arbitrary and capricious conduct, the claimant . . . would have . . . receive[d] the benefits or where there was no evidence in the record to support a . . . denial of benefits."[193]

Defendants' denial of benefits for A.G.'s treatment at Second Nature was arbitrary and capricious because Defendants failed to provide a sufficient explanation and analysis for the denial of benefits.[194] Plaintiffs have succeeded in challenging the denial of benefits. But on this

---

190 *DeGrado*, 451 F.3d at 1175 (internal quotations omitted).

191 *Id*.

192 *Id*. (internal quotations and punctuation omitted).

193 *Id*. (internal quotations and punctuation omitted).

194 *Supra* Discussion at 34-37.

record, it is not clear that the Plan should have covered A.G.'s treatment at Second Nature. And an award of benefits will not be made when a plaintiff's right to benefits is not "clearcut."[195] Therefore, it is necessary to remand Plaintiffs' claim for benefits to Defendants for reevaluation and redetermination.

On remand, Defendants must exercise their discretion as administrators in good faith, and may not deny coverage on any basis other than the Plan's exclusion for "Experimental or Investigational or Unproven Services." And any denial of coverage must include specific explanation and analysis, as required by ERISA and its regulations.

**Defendants are entitled to summary judgment on Plaintiffs' claim for equitable relief**

Defendants seek summary judgment on Plaintiffs' claim for equitable relief.[196] Plaintiffs did not respond to Defendants' arguments regarding the claim for equitable relief.[197] And Plaintiffs affirmatively represent that they are no longer seeking equitable relief.[198] Therefore, Defendants are entitled to summary judgment on Plaintiffs' claim for equitable relief.

**Prejudgment interest and attorney's fees are reserved**

Plaintiffs have requested awards of prejudgment interest and attorney's fees if successful on their claim for benefits, and have requested the opportunity future briefing on these issues.[199]

In ERISA cases, "[p]rejudgment interest is . . . available in the court's discretion."[200] Additionally, under 29 U.S.C. § 1132(g)(1), attorney's fees may be awarded when a "claimant

---

[195] *Rekstad v. U.S. Bancorp*, 451 F.3d 1114, 1121-1122 (10th Cir. 2006).

[196] Defendants' Motion for Summary Judgment at 29-32.

[197] Plaintiffs' Response at 33.

[198] *Id*.

[199] Plaintiffs' Motion for Summary Judgment at 38.

[200] *Weber v. GE Grp. Life Assur. Co.*, 541 F.3d 1002, 1016 (10th Cir. 2008) (quoting *Benesowitz v. Metropolitan Life Ins. Co.*, 514 F.3d 174, 176 (2d Cir. 2007)).

has achieved 'some degree of success on the merits.'"[201] Factors for determining whether an award of attorney's fees is appropriate include:

> (1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of fees; (3) whether an award of fees would deter others from acting under similar circumstances; (4) whether the party requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions.[202]

"No single factor is dispositive and a court need not consider every factor in every case."[203]

Plaintiffs have achieved some success on the merits of their claim for benefits.[204] However, the claim is remanded to Defendants for reevaluation and redetermination. No determination is made regarding Plaintiffs entitlement to benefits under the Plan, and no damages are awarded to Plaintiffs at this time. A determination of whether prejudgment interest and attorney's fees are appropriate will also be benefited by further briefing. Therefore, determination of whether prejudgment interest and attorney's fees are appropriate is reserved pending Defendants' reevaluation and redetermination of Plaintiffs' claim for benefits.

---

[201] *Cardoza v. United of Omaha Life Ins. Co.*, 708 F.3d 1196, 1207 (10th Cir. 2013) (quoting *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 245 (2010)).

[202] *Id*.

[203] *Id*.

[204] *Supra* Discussion at 34-37.

**ORDER**

IT IS HEREBY ORDERED that Plaintiffs' Motion for Summary Judgment[205] is GRANTED in part and DENIED in part, and Defendants' Motion for Summary Judgment[206] is GRANTED in part and DENIED in part as follows:

(1) Plaintiffs' claim for benefits[207] is REMANDED to Defendants for reevaluation and redetermination;

(2) Plaintiffs' claim for equitable relief[208] is DISMISSED with prejudice; and

(3) Determination of whether prejudgment interest and attorney's fees are appropriate is reserved pending Defendants' reevaluation and redetermination of Plaintiffs' claim for benefits.

IT IS FURTHER ORDERED that Plaintiffs' claim for benefits is REMANDED to Defendants for reevaluation and redetermination. Defendants must perform the reevaluation of Plaintiffs' claim for benefits and inform Plaintiffs of their benefits decision within 30 days. In performing the reevaluation and redetermination, Defendants are precluded from denying benefits on any basis other than the Plan's exclusion for "Experimental or Investigational or Unproven Services." And any denial of benefits must include specific explanation and analysis, as required by ERISA and the Plan's claim procedure.

IT IS FURTHER ORDERED that the Clerk is directed to administratively close the case. Within 14 days after Defendants provide Plaintiffs with notice of their determination on Plaintiffs' claim for benefits, either party may file a motion to reopen the case for further

---

[205] Docket no. 116, filed Aug. 4, 2021.

[206] Docket no. 112 (redacted version), filed July 30, 2021, docket no. 114, filed under seal July 30, 2021 (unredacted version).

[207] Complaint ¶¶ 1-4 at 11-12.

[208] *Id.* ¶¶ 1-5 at 12-13.

proceedings. Any motion to reopen the case must identify the legal basis on which the case may be reopened and the specific issue or issues for which determination is sought.

Signed September 12, 2024.

BY THE COURT

David Nuffer
United States District Judge